[Civ. No. 19318. Second Dist. Div. Three. Dec. 4, 1953.]

LESTER MELOY et al., Respondents, v. THE TEXAS COMPANY (a Corporation), Appellant.

Clock, Waestman & Clock, Henry H. Clock and Iverson & Hogoboom for Appellant.

Ball, Hunt & Hart and Joseph A. Ball for Respondents.

WOOD (Parker), J.—Action for damages for personal injuries resulting from an explosion that occurred while plaintiffs were cleaning pipes in a crude oil heater of an oil refinery. Judgments, entered in accordance with verdicts, were as follows: $65,000 for plaintiff Meloy; $20,000 for plaintiff Evans; and $10,000 for plaintiff Bucci. Defendant appeals from the judgments.

Appellant contends that the plaintiffs were special employees of appellant as a matter of law, and that their remedy was a proceeding before the Industrial Accident Commission; appellant was not negligent and the doctrine of res ipsa loquitur is not applicable; plaintiffs were guilty of contributory negligence; plaintiffs assumed the risk; the court erred in rulings as to admissibility of evidence, and in refusing to give an instruction; plaintiffs' counsel committed misconduct in his argument; and the damages were excessive.

Defendant owned and operated an oil refinery in Los Angeles County. A part of the refinery apparatus was a crude oil heater, which was a part of "Vertical Still No. 2." The still was connected by pipes and conduits with other stills and parts of the refinery that contained inflammable and explosive vapors and fluids, which vapors and fluids cir-

culated through those pipes and conduits into pipes of the heater. About every six months it was necessary to clean the heater pipes.

Petroleum Maintenance Company, which was in the business of repairing and maintaining various oil refineries, had an office on defendant's premises and had a contract with defendant to make repairs on defendant's refinery at places directed by defendant. When defendant wanted employees of said maintenance company to perform services at defendant's refinery, the customary practice was that defendant's engineering department would send a work order to the office of the maintenance company, and the foreman of that company would send a crew of its employees to perform the services.

Plaintiffs were employees of the maintenance company and had been such employees for three or four years prior to the accident. Meloy was a pipefitter and a foreman of a crew of workmen. Plaintiffs Evans and Bucci were pipefitter's helpers.

On September 6, 1949, pursuant to a written work order issued by defendant on September 5, the maintenance company sent a crew of six employees, including plaintiffs, to clean the pipes in Vertical Still No. 2. Meloy, the foreman of the crew, was directed orally by Mr. Coats, the foreman of the maintenance company, to unhead and clean the black oil section and heater of said still.

Still No. 2 is one of several oil cracking units in the refinery. The heater is a boxlike building with a furnace in the lower part thereof and tubes in the upper part. Oil circulates through the tubes. A highly inflammable oil, referred to as clean oil, flows through a section of the tubes which is directly above the furnace. A heavy black residue of oil, referred to as black oil, flows through a section of the tubes which is above the clean oil tubes. The temperature of the clean oil when flowing through the tubes is about 985° Fahrenheit. The oil products pass from the heater through three towers in which the refining process is completed. Preparatory to cleaning the tubes it is necessary to shut down the operation of the still. The work of shutting down the operation and preparing the tubes for cleaning was done by the defendant. The usual procedure in doing the preparatory work is to shut down the furnace, insert blinds in the pipes leading to the heater, disconnect the pipes between the heater and the towers, and remove the residue of oil from the tubes by a

flushing process which requires five hours and consists of using light clean oil, then steam, and then water. The heat in the fire box or furnace prior to shutting down is usually about 1500°, and after the preparatory work is finished the heat in the fire box (which has thick brick walls) is about 600°. The bricks in the fire box might be very hot. If inflammable and explosive vapors and fluids are present in the tubes, the work in cleaning the tubes is dangerous. The cleaning operation which follows the preliminary work consists of removing the bends or fittings which connect the tubes, and then knocking the coke and other accumulations out of the tubes. Meloy and the men in his crew did not know anything about the engineering features or the operation of the refinery or what might be in the lines which connect the heater and other parts of the refinery.

On September 6th, Meloy asked an employee of defendant, who was in the control room of Still No. 2, if the heater was ready to be opened. Another employee, who was in the control room and was reading the log book, said that it was in proper shape to work on. The tubes extended through the still in an east-west direction in horizontal layers. The ends of the tubes (outside the still) are connected by "U-tubes," known as bends or fittings. Plaintiff Meloy and his crew removed the bends from the clean oil section on the west side of the still. There were about four rows of those tubes, with 20 tubes in each row. The work in removing those bends required about two and one-half hours. Nothing unusual occurred while they were doing that work. Then they went to the east end of the still and removed some of the bends from the bottom row of tubes. Meloy smelled gas when they disconnected a line. He thought the gas was coming out of the line at the place where they disconnected it. Other members of his crew noticed vapor coming from the line. Meloy then stopped the work. Sudduth, a foreman for defendant, also noticed the vapor. Then Meloy and Sudduth went into the control room and Sudduth talked with Nance therein, who was a control man. Meloy testified that Sudduth and Nance went to the heater, looked it over, and Nance pulled some of the valves; then Nance told Meloy "to go back to work on it, it was all right." Meloy and his crew then continued the work of removing the bends. They were standing on a platform which was about 12 feet above the pavement and were removing bends which were above the fire box. Meloy testified that after some of the bends were

removed, an oil which appeared to be a light oil ran out of the tubes. Then there was an explosion, and flames burst out and went up from the fire box and seemed to cover the platform. Meloy jumped from the platform to the ground. Evans was blown off the platform. Bucci fell over or was blown over the railing of the platform. They suffered personal injuries.

■ As above stated, a contention of appellant is that plaintiffs were special employees of appellant and their sole remedy was for workmen's compensation. It argues that appellant had the right to control and did control the plaintiffs in the work of cleaning the heater; that by reason of such right of control appellant became the special employer of plaintiffs. The burden was upon appellant to prove its allegation that plaintiffs were its special employees. (See *Popejoy* v. *Hannon*, 37 Cal.2d 159, 174 [231 P.2d 484].) There was a written contract between the Petroleum Maintenance Company and appellant with respect to the method of compensating the maintenance company. Since the contract was not offered in evidence, it might be inferred that the provisions thereof were contrary to the interests of appellant. If appellant was doing its own maintenance work with borrowed employees, there would have been no occasion for a contract with the maintenance company. The maintenance company does maintenance and repair work for other refineries such as Wilshire Oil Company, Standard Oil Company, Associated Oil Company, and Stauffer Chemical Company. It furnishes an identification badge to each of its employees, which badge bears the name of the maintenance company and the number assigned by that company to the employee. Their employees, when reporting for work, go to a building on appellant's premises bearing the sign "Petroleum Maintenance," and they check in on the maintenance company's time clock. Those employees are paid by the maintenance company. Meloy, who had been a pipefitter for 20 years, was a skilled workman. On September 6th prior to the accident the foreman of the maintenance company gave Meloy, the foreman of a crew of workmen, a written order from appellant for the repair work. The foreman of the maintenance company also gave him oral instructions to do the work and assigned a crew of employees to assist him. Meloy testified that he had never been assigned to his work by anyone except a maintenance company officer; he had never worked in a mixed crew or crew made up of

employees of appellant and the maintenance company; only maintenance company employees had been assigned to his crews; the policy of the appellant is the same as in other oil refineries—that the operating department of the refinery never directs them (maintenance employees) as to the manner in which they should do their work—the department tells them what to do and when to do it, but not how to do it. It was the duty of the operating department of the appellant to close all valves that permit petroleum products to enter the heater. The employees of the maintenance company were not permitted to close or open a valve. There was testimony by Mr. Noble, the superintendent of the maintenance company (called as a witness by appellant), that the employees of the maintenance company worked in a mixed crew with employees of the appellant on the day of the accident; that all the men working with Meloy were on the payroll of the maintenance company; that by the expression "mixed crew" he meant that the heater was not all the unit—it did not include the whole unit—that appellant had some men working on the unit. Employees of appellant, who had duties in connection with the operation of said unit or Still No. 2, were a still man, a control man, and a fireman. Mr. Bishop, an assistant supervisor of appellant for the area in which said unit was located, testified to the effect that said employees of appellant worked under the direction of a foreman, and that their work pertained to the operation of the unit—the actual running of petroleum through the still and vats— and had nothing to do with the repair or maintenance of the plant. It was a question of fact whether plaintiffs were special employees of appellant. The court gave instructions properly defining an independent contractor, employee, and special employee. ██ The evidence was sufficient to support findings that plaintiff Meloy, the foreman of the maintenance company's crew, was a skilled pipefitter, and it was not necessary for anyone to direct him as to the manner in which he should do his work; that appellant did not control or have the right to control said crew as to the manner or method in which it performed the work of cleaning the heater; and that plaintiffs were not special employees of appellant.

Appellant also contends that the doctrine of res ipsa loquitur is not applicable. It argues that the still had been turned over to Meloy and his crew and there was no evidence that the still was under the control of appellant. Meloy and

his crew knew nothing about the engineering features of the still. The maintenance company employees were not allowed to close or open a valve; their work pertained only to the cleaning, repair, and maintenance of the heater, which was a part of the still or unit. Employees of appellant did the work preparatory to closing the heater, such as shutting down the operation of the unit, closing valves, and inserting blinds in lines connecting the heater with towers and other parts of the unit. The maintenance company did not have, any control, or the right to any control, over that work. Although the employees of the maintenance company were in charge of the work of cleaning the heater after it had been prepared by appellant, they were not in charge of, and they did not have any connection with, any other work pertaining to the unit. They had no control over the mechanism of the refinery which allowed oil to flow to or from the heater. Employees of appellant; namely, a still man, a control man, and a fireman (who were under the supervision of a foreman), remained in charge of the other parts of the unit, such as towers and the lines leading to and from the heater. There was evidence that appellant, in preparing the heater for cleaning, placed blinds in all the lines leading to or from the heater with the exception of one clean oil line leading to the heater. In that line, in which there was no blind, there were two block valves and between those valves there was a bleeder (an outlet or drain to the sewer). Mr. Jones, the operating supervisor of oil cracking equipment for appellant, testified that there were two ways in which it would have been possible for oil from the tank to back up into the tubes of the heater, assuming that the heater had been steamed out properly; one of those ways was that if the steam pressure inside the tubes had been reduced to approximately zero before the block valve to the tank was closed, it would have been possible for oil to back up into the tubes; the other way was that oil could have leaked from the fractionating tower through the two block valves (if the bleeder was closed); he checked both valves and the bleeder (after the accident) and found that the valves were closed and the bleeder was open; and it is the duty of the operating department of appellant to see that those valves are closed and that the bleeder is open. He testified further that if the valves are closed properly at the proper time and the valves are in good shape, then oil could not get into the heater; that if the valves were not

closed, obviously oil could have leaked into the heater from the tower if there was any pressure in the fractionating tower; there was no pressure in the tower. Mr. Palmer, a still man for appellant—on the day shift—testified that the night shift still man for appellant had not put a blind in a clean-oil outlet line; that Mr. Russell (a pipefitter foreman for the maintenance company) discovered that the blind was not in. Russell testified that after the accident he found that the bleeder was closed. The maintenance company did not have any control, or the right to any control, over the work in preparing the heater for cleaning. It cannot be said that the maintenance company, in performing the work of cleaning the heater after the heater had been prepared for cleaning by appellant, had exclusive or any control, or the right to any control, over the part of the refinery unit from or through which oil could enter the heater. In *Hinds* v. *Wheadon,* 19 Cal.2d 458 [121 P.2d 724], an employee of an independent contractor (who conducted a welding business) went to the premises of defendant (who conducted a business of treating crude petroleum) for the purpose of welding a steel dehydrating tank. An employee of the defendant therein told the welder that the tank (which was used in treating crude petroleum) had been washed out and filled with water. While the welder was finishing the top weld, the tank exploded and he was killed. The court held that the doctrine of res ipsa loquitur was applicable therein, and said at page 461: "The evidence introduced by plaintiffs, however, indicates that the explosion was caused by the unexplained absence of water at the top of the tank behind the spot where the welding was to be done. The work done by deceased on the outside of the tank had no relation whatever to the complicated system of valves and pipes which regulated the water level within the tank and, insofar as the matter can be determined upon the evidence introduced by plaintiffs, such matters were within the exclusive control of the defendants." In the present case the work done by plaintiffs in cleaning the heater had no relation to the complicated system or mechanism of towers, pipes, and valves which regulated the flow of oil into and from the heater. That system or mechanism was under the exclusive control of appellant. The doctrine of res ipsa loquitur was applicable herein.

Appellant also contends that plaintiffs were guilty of contributory negligence as a matter of law. It argues that

Meloy had seen vapors escaping from the pipes, and that all the plaintiffs were aware of the dangerous situation; they continued working and using equipment known by them to be dangerous; their conduct in remaining at work cannot be justified upon any theory of reliance upon assurance by Nance that the heater was all right to work on—especially in view of the perfunctory examination by Nance of a certain valve.

Whether or not plaintiffs were justified in relying upon such statement of Nance was a question of fact for the jury. They were not guilty of contributory negligence as a matter of law.

Appellant also contends that as a matter of law plaintiffs assumed the risk of the employment. It argues that the plaintiffs, with knowledge of the dangerous condition of the heater, voluntarily remained in the dangerous area. The statements made herein with respect to the question of contributory negligence are applicable here. It cannot be said as a matter of law that plaintiffs assumed the risk.

Appellant also contends that the court erred in failing to give an instruction requested by it. That instruction was to the effect that if the jury found that plaintiffs were the general employees of the maintenance company, and that on the day in question said employees were hired by appellant to do certain work on appellant's premises, and that plaintiffs were directed by agents of appellant with respect to when the work was to be performed, the manner of performance, the safety precautions to be exercised, the number of employees to be utilized in performing work, and that appellant directed or controlled the work done by plaintiff, then the jury should find that plaintiffs were special employees of appellant. The court gave six instructions, requested by appellant, with respect to the subject of special employee.[1] Those instructions

---

[1]The instructions so given were to the following effect:

1. If any plaintiff was a special employee of appellant, then such plaintiff is not entitled to prosecute this action for damages and the exclusive jurisdiction of actions arising from such injury is in the Industrial Accident Commission; and if the jury should find that any plaintiff was such a special employee, the verdict should be for appellant.

2. In this instruction the terms ''special employee'' and ''independent contractor'' were defined, and then the jury was instructed that in determining whether any plaintiff was a special employee of appellant, the following rules are requisite for establishing such employment: That the appellant had the right to control and direct the activities of some of the plaintiffs or the manner in which the work of some of the plaintiffs was performed, whether or not such right of control was exercised.

3. That the test whether a person is an employee or independent contractor is whether the principal has the right of control over the manner

which were given were adequate to cover the matters included in said refused instruction. It was not error to refuse to give the instruction.

    ■  A further contention of appellant is that plaintiffs' counsel committed misconduct in his argument to the jury. Plaintiffs' counsel said, in referring to appellant: "They are in business. They are an industrial organization. They sell products all over the country. The amount that would be awarded against them is nothing compared to the loss to Meloy if you don't award it. Now, as I say, if you are going to make somebody gamble in this case on what the damages should be, I ask you if it is not fair not to make Meloy gamble." Counsel for appellant cited that statement as misconduct on the ground that the ability to respond in damages may not be used as a basis for the amount of damages. Counsel for plaintiffs then said that that is correct, and the financial responsibility of the defendant should not be considered. The court said: "Well, yes. I think the jury should be admonished that the financial ability of the defendant is not to be made the test of any award that might be made here . . ." In view of the admonition of the court, it cannot be said that counsel's statement was prejudicially erroneous. Other statements of plaintiffs' counsel, referred to on appeal as statements constituting misconduct, are set forth in the margin below.[2] No objection was made to said statements at the trial and there was no citation of misconduct regarding them. It might well be that no objection was made to them because the statements when heard as a part of the whole argument, and not out of context, did not seem to carry the meaning

of the performance of the services; the use or the lack of use of such right of control is not important in deciding that issue.

    4. That a person may be both a general employee of one employer and a special employee of a special employer if the following requisites are present: A loaned employee situation in which an employee of one is sent to perform labor for another. A joint participation in the work and benefit to each from its rendition. Some power "of direction and control of details in each."

    5. That if the jury should find that plaintiffs were special employees of appellant, then the exclusive remedy of plaintiffs is to proceed under the industrial compensation laws, and the jury should return a verdict for appellant.

    6. This instruction contained definitions of independent contractor and employee.

    [2]Statements of plaintiffs' counsel:

    1. "Now, whether The Texas Company is a large or small organization makes no difference essentially, ladies and gentlemen, in determining damages, but I simply say this: Who should bear the risk, who should bear the risk of whether or not Meloy is going to work seven and a half

now assigned to them by appellant. Immeditely following the second statement appearing in the margin, plaintiffs' counsel said: "When damages are awarded to an individual, that is compensation for something you can't give back, a couple of good feet, a good arm, a good back. It is hard to measure that [in] money. The only way you can measure it in money is to try to give them bread-and-butter money over the long period, and to give them something for pain and suffering." Preceding the third statement appearing in the margin, plaintiffs' counsel had made statements to the effect that the 1931 dollar had shrunk so that now it would buy about one-third as much as it bought in 1931, and that is the reason he was saying that a verdict of $25,000 or $30,000 would be inadequate—it would be 1931 prices against a 1951 injury; that $75,000 is not a lot of money if you spread it over the lifetime that is left. Since no objection to the statements was made at the trial, it may be deemed on appeal that misconduct, if any, by reason of the statements was waived. (See *Paul* v. *Key System*, 80 Cal.App.2d 21, 26-27 [180 P.2d 940, 944].)

Appellant contends further that the court erred in rulings as to admissibility of evidence. Objections were sustained to certain questions which appellant asked its witnesses Coats, Noble, and McAllister in an attempt to show that appellant had the right of control over plaintiffs. Appellant argues that the witnesses held positions of supervisory responsibility and had knowledge of the relationship between the two employers; that the answers to the questions, if allowed, might have shown who gave the orders and who had the right of control.

Witness Coats, a foreman of the maintenance company (called as a witness by appellant), testified that on September 6, 1949, it was the duty of Meloy and his crew to unhead the heater and clean the tubes. Thereupon counsel for appellant asked, "Now, who were they to take orders from?" An objection by counsel for plaintiffs was sustained on the ground that

years? The plant, the organization, the defendant who caused the injury, or Meloy, because if you don't give him an adequate amount he bears 100 per cent of his loss now and he is the fellow that lost the feet, not The Texas Company."

2. "Furthermore, when damages are awarded against a defendant and he has paid, that is a cost of doing business."

3. "These are days when you pay $50,000 for one little broadcast. They pay some silly fellow to make monkeyshines $10,000, to stand up and make a speech. Bob Hope and those fellows get out there and they make lots of money."

the question called for a conclusion. Appellant argues that said question called for a factual answer which was within the knowledge of the witness; and that under the case of *Majors* v. *Connor*, 162 Cal. 131 [121 P. 371], the question was proper. In said case a witness was asked: "When you produced the labor, the men, and put them on the job, under whose control and management were they?" and "Under whose control did you do the work?" It was held therein that those questions were proper—they were tantamount to an inquiry, "Who gave the orders?" In the present case, after said objection was sustained, counsel for appellant asked the witness if, during the time he (witness Coats) was in charge of Meloy and his crew, he gave any instructions to them as to whom they were to take orders from on that job. The witness replied, "I don't remember that I gave them instructions." Appellant then offered to prove by said witness that the supervisor for appellant had the right to tell the employees of the maintenance company what to do, and how, where, and when to do it; that the maintenance company employees were under the supervision of appellant's supervisor; and that the supervisor had the right to discharge maintenance company employees from the job. The judge said that he would not reject that offer of proof, but he said that evidently appellant could not make the proof with said witness, since the witness did not remember what instructions he gave. Thereafter, counsel for appellant asked: "When Petroleum Maintenance crews were unheading The Texas Company heater in September of 1949, under whose direct supervision were they working?" Counsel for plaintiff said that he had no objection to that question. The witness replied, "Well, they could be working under my supervision or The Texas foreman's supervision." Counsel for appellant asked the witness: "If Petroleum Maintenance crews, in unheading a heater in September of 1949, had any questions as to procedure, whom were they to go to to take that up?" The witness replied, "If I wasn't there they could ask The Texas Company foreman. Counsel for appellant thereafter asked if the maintenance company in September, 1949, had any regulations as to the manner in which its employees "would be directed while working" at appellant's refinery. The witness replied, "You know, I don't remember that." Counsel for appellant then asked, "As foreman, had you received any instructions from your superiors as to whom or from whom your employees

were to take directions while working at The Texas plant?'' The witness replied, ''I would rather not answer that. I don't remember.'' It thus appears that after the offer of proof had been made, counsel for appellant asked questions which were in substance the same as the question to which the objection had been sustained; and that the court permitted those subsequent questions to be answered. Those answers were to the effect (1) that the maintenance company employees would be working under the supervision of the foreman of the maintenance company or the foreman of appellant; or (2) that the witness (Coats) did not remember whether he had received any instructions as to whom the maintenance company employees were to take directions from while working at appellant's plant. Appellant was not prejudiced by the ruling sustaining the objection.

Witness McAllister, chief engineer for appellant, was asked by appellant if the plaintiffs were subject to any direction or supervision by The Texas Company when they (plaintiffs) were working the day shift. An objection thereto was sustained on the ground that the question called for a conclusion. Appellant then asked the witness if he had any personal knowledge as to whether the plaintiffs took orders from employees of The Texas Company in September, 1949. The witness replied: ''On this particular day they were working on a job that was directly under the supervision of Texas Company supervisors.'' The answer was stricken out on the ground that it was a conclusion. Thereafter counsel for appellant asked the witness whether any of the plaintiffs took orders from appellant's employees on September 6, 1949. He replied, ''No''—that he had ''no personal knowledge.'' It thus appears that, after the objection was sustained and the motion to strike was granted, a question similar to said previous question was asked and the answer thereto was permitted to stand. The said rulings were not prejudicial.

Witness Noble, superintendent of the maintenance company, was asked by appellant if in September, 1949, The Texas Company had ''the right to direct you to remove workers and replace them with other workers?'' and ''Do you know of your own knowledge if The Texas Company had any right to require you to replace workers at their property and replace them with other workers?'' Plaintiffs objected to those questions on the ground that they called for conclusions. The objections were sustained. There was no offer to prove by the witness that the appellant had such right as that referred

to in those questions. The questions did not indicate that the answers thereto would be favorable to appellant. Since there was no offer of proof, and since the questions did not indicate answers favorable to appellant, it cannot be said that the rulings were prejudicial. (See *Newton* v. *Los Angeles Transit Lines,* 107 Cal.App.2d 624, 626 [237 P.2d 682].)

Appellant also contends that the amounts awarded as damages were excessive. Mr. Meloy sustained a comminuted compression fracture of the heel bones of both feet—the heel bones were pushed together and crushed upward. He was in a hospital about four months. There was evidence that said injury was permanent; by reason of the injury there is a loss of lateral mobility of the heels and he walks by turning his right foot out and swinging from the hip; he will suffer pain from the injury for the remainder of his life; the pain would be relieved if an operation were performed on the heels, but he would be in a hospital one month, in a wheel chair two months, and he would have to walk in a cast about four months; also, as a result of surgery his ankles would be stiff—but there would be a chance for some improvement in the motion; he will never be able to do heavy work; at the time of the injury he was 48 years of age and was earning about $3,700 a year; he had a life expectancy of approximately 21 years. Also he suffered burns about the face, ears, arms, and hands; and the amount of his medical expenses was $2,013.03.

Mr. Evans sustained a fracture of the fibula of his left leg and a comminuted fracture of his left wrist; he was in a hospital about thirty days; as a result of the injury his wrist was permanently malformed; flexion of his wrist was reduced about 20 per cent; when he resumed work after three months, he helped with janitor work; he was lame in his ankle; when he went back to work, his wrist hurt all the time; the pain might be relieved by surgery—removing a section of the ulnar, but the stability of the wrist joint would not be normal; his left arm was weak and he had no grip in his left hand; he could not do his share of the work as a pipefitter's helper —he did the lightest work; he had a life expectancy of approximately 14 years; at the time of the accident his take-home pay was about $2,800 a year. The amount of his medical expenses was $498.29.

Mr. Bucci sustained burns about the face, arms, and neck, a dislocated coccyx, and a fracture of the lower sacral

segment. He was in a hospital eight days and saw his doctor regularly thereafter for a month. There was evidence that at the time of trial he still suffered pain in the lower part of his back—a dull ache was there about all the time; after sitting about an hour, the left side of his back gets a little numb and the numbness creeps down his leg; there has been no improvement during the last year; he did not continue his work as a pipefitter's helper because the work strained his back; he became a painter for the maintenance company. The amount of his medical bill was $209.36.

One of the grounds upon which the motion for a new trial was made was that the damages were excessive. That motion was denied. In *Roedder* v. *Rowley*, 28 Cal.2d 820, it was said at pages 822-823 [172 P.2d 353]: ''Since there is no exact correspondence between money and physical or mental injury and suffering, the various factors involved are not capable of exact proof in terms of dollars and cents, and the only standard is such an amount as a reasonable person would estimate as fair compensation.'' The evidence supports the awards of damages.

The judgments are affirmed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied December 28, 1953, and appellant's petition for a hearing by the Supreme Court was denied January 27, 1954. Edmonds, J., and Schauer, J., were of the opinion that the petition should be granted.