[L.A. No. 29936. In Bank. July 12, 1972.]

JOHN GYERMAN, Plaintiff and Appellant, v.
UNITED STATES LINES COMPANY, Defendant and Respondent.

## Counsel

George E. Shibley, Margolis, McTernan, Smith, Scope & Herring, Ben Margolis, Saltzman & Goldin and Martha Goldin for Plaintiff and Appellant.

Ball, Hunt, Hart, Brown & Baerwitz, Clarence S. Hunt, Richard Goodman, Donald B. Caffray and Roger S. Shafer for Defendant and Respondent.

## Opinion

**SULLIVAN, J.**—In this action for damages for personal injuries, plaintiff John Gyerman appeals from a judgment entered after a nonjury trial denying him any recovery against defendant United States Lines Company (United States Lines).

 We set forth the pertinent facts.[1] Plaintiff, an experienced longshoreman, was an employee of Associated Banning Company (Associated Banning), a stevedore company. Plaintiff was assigned to work in a warehouse operated under a lease by defendant United States Lines at Wilmington, California. The warehouse was adjacent to a dock and was used to store cargo unloaded from vessels. On the occasion in question, 100-pound burlap sacks of fishmeal, stacked on wooden pallets, had been unloaded from the hold of a vessel and moved by forklifts into the warehouse for storage. Plaintiff's job was to "break down" the stacks in the warehouse with a forklift so that they were no more than two pallets

---

[1]We state the facts in accordance with the general rule that an appellate court will view the evidence in the light most favorable to the respondent and will indulge in all intendments and reasonable inferences to sustain the findings and the judgment. (*Peterson* v. *Grieger, Inc.* (1961) 57 Cal.2d 43, 51-52 [17 Cal.Rptr. 828, 367 P.2d 420]; *McCarthy* v. *Tally* (1956) 46 Cal.2d 577, 581 [297 P.2d 981].)

high and could be more easily loaded by the truckers picking up the cargo for delivery to its consignees.

The fishmeal was a difficult cargo to handle, because the sacks had a tendency to tear and to spill their contents. As a result the stacks were subject to shifting and tilting. The sacks of fishmeal were usually piled onto palletboards three or four layers high, with 18 to 22 sacks on each pallet. As a general practice the sacks were "bulkheaded" or tied in. In other words, they were so arranged that no one sack was directly on top of another, but rested on several sacks for firmer support, analogous to the arrangement of bricks in a building.

Upon arriving at defendant's warehouse on a Monday, plaintiff noticed that some of the fishmeal stacks were unusually arranged. They appeared to have more than 30 sacks to a pallet, and were not "bulkheaded."[2]

There was a conflict in the testimony as to plaintiff's actions following these observations. Plaintiff testified that on the first morning he complained to defendant's chief marine clerk, Kenneth Noel, asking the latter, "How do you expect me to break this down with this hazardous condition that you have over here on this land side?" According to plaintiff, Noel replied, "John, there is nothing I can do about it. Just do the best you know how." Called as a defense witness, on direct examination, Noel denied that he had any conversation with plaintiff about the safety of the loads. On cross-examination, he reiterated this denial even when challenged with a statement in his deposition, taken a year and a half after the accident, that he did not remember whether or not such a conversation had taken place.[3]

Plaintiff, who was the only longshoreman assigned to "breaking down" the stacks, spoke to no one else about the condition of the cargo. The only supervisory personnel with whom he had contact on this job were his foreman and defendant's marine clerk, Noel. The record is unclear as to the extent of the latter's authority over the longshoremen. The major function of defendant's warehouse employees was to keep track of the movement of the cargo. However, defendant's marine clerks directed Asso-

---

[2]During the unloading of the cargo in question, two disputes culminating in arbitrations arose from the building of the unusually heavy loads of 30 rather than 18 to 22 sacks of fishmeal per pallet. Arbitrators ruled that different gear and additional men would be required if 30-sack palletizing was to be used. Thereafter, the heavy loading was discontinued, but 30-sack loads already built remained in the warehouse to be broken down.

[3]At oral argument before us, defendant's counsel accepted plaintiff's version of his conversation with Noel, because the trial court did so in its memorandum of decision.

ciated Banning's forklift operators on such matters as where to place the pallets of cargo and how they should be stacked.

Plaintiff testified that the only effective supervision of his work was by defendant's marine clerks, that he was under orders from his own foreman to take directions from defendant's employees, and that refusal to do so could subject him to discharge by his own employer. He stated that he complained about the cargo to Noel "[b]ecause he was the only one there acting on part of supervision, and, also, as chief supervisor for the U.S. Lines." However, the record also indicates that it was not the function of defendant's marine clerks to supervise the work methods of Associated Banning. Plaintiff's own foreman, who was supervising 15 to 20 other longshoremen at a pier six to eight blocks away, appeared at the warehouse for only a few minutes each day. His primary function was to ascertain for payroll purposes whether plaintiff was working and whether or not he would be needed for another day on this job.

Plaintiff's safety expert, Joseph Bayer, testified on cross-examination that it was both the duty and the right of a longshoreman to refuse to handle clearly dangerous overloads. Bayer also stated that there is "[n]o way whatsoever" for a longshoreman to remove the cargo once it is stacked three pallet boards high, with 30 or more stacks per pallet board, without exposing himself to danger. Noel testified that it was the custom on the docks for a longshoreman who found a dangerous condition to report it to his business agent.

Herman Hargett, manager of labor relations for Associated Banning, was subpoenaed and called as a witness by defendant. His duties were to represent not only Associated Banning but the industry as a whole in negotiations and disputes pertaining to contracts between the longshoremen and the various employers belonging to the Pacific Maritime Association. He testified that the dock foreman was the immediate superior of the longshoremen working on the dock and in the warehouse, including those operating forklifts, but that defendant's marine clerks told the forklift operators where to place the cargo and how high to arrange the stacks of pallets. He stated that "if [a condition] is unsafe, he should immediately stop work until it is made safe. This is contractual language," referring to the contract between the Pacific Maritime Association and the International Longshoremen's Union.[4]

[4]At the close of its case, the defense read into evidence certain sections of this agreement, of which the following are relevant to the issues before us:
"*No Strikes, Lockouts and Work Stoppages.*
" . . . . . . . . . . . . . .
"Section 11.4 *Exceptions for Health and Safety.*
"Section 11.41: Longshoremen shall not be required to work when in good faith

According to Hargett, under this contract, if a longshoreman encountered an unsafe condition, he was supposed to stop work immediately. "In Gyerman's case, if there was no supervision there immediately to take care of the situation, why, he would have to surmount it by setting it aside or getting another lot to work on, or have supervision called, which in this case the U.S. Lines would have called us, and we would have sent men there to take care of the situation, if he was in such a condition he couldn't operate."

After his conversation with Noel, plaintiff proceeded to break down the fishmeal stacks by using a forklift, which was equipped with a canopy to protect the operator against being struck by falling cargo. During his first three days on the job, more than the usual number of sacks tumbled from loads which plaintiff was moving, but all were deflected from striking him by the forklift's canopy. At 4 p.m. on Thursday a dozen or more sacks fell at once from the top of a load that plaintiff was moving, causing a ricochet effect. At least one of the sacks was apparently propelled toward plaintiff from an unprotected side of the forklift. Plaintiff recalls seeing the entire load shifting towards him, as if sacks were falling off the top pallet. He found himself on the floor on the left side of the forklift opposite the seat, without knowing exactly what knocked him off the vehicle. As a result he sustained injuries to his lower back and legs.

Plaintiff commenced the present action for damages for the personal

---

they believe that to do so is to immediately endanger health and safety. Only in cases of bona fide health and safety issues may a standby be justified. . . .

". . . . . . . . . . . . . . . . . . .

"Supplement III.

". . . . . . . . . . . . . . . . . .

"Section 1.6: When, in good faith, a legitimate question of health and safety arises on the job, immediate use of the grievance machinery is required.

"Section 1.7: It is understood and agreed that in cases where the ILWU Business Agent or proper union representative maintains that an unsafe condition exists which can immediately endanger the health and safety of the men should they work as directed, an immediate Joint Port Labor Relations Committee meeting will be held on the job. . . .

"Section 2: The following procedure, therefore, will be followed when a question of health and safety is involved in a dispute on the job:

"2.1. Not being satisfied with the instructions as to how work shall proceed, the men must ask their steward to request the safety matter be brought to the attention of the foreman or walking boss in immediate charge of the operation.

"2.2. The men shall remain on the job during the shift until a decision has been reached as to how work shall proceed. The steward and his immediate superior (gang boss, hatch boss, etc.) are the only individuals who shall present the situation to the foreman or walking boss. If necessary, the Business Agent shall be called. The Joint Coast Labor Relations Committee agrees that the walking boss, gang boss or hatch boss, and the Business Agent or steward, who are responsible and safety-minded individuals, should be able to determine whether a condition is safe or unsafe."

injuries allegedly caused by defendant's negligence. Defendant denied the material allegations of the complaint and as an affirmative defense asserted that plaintiff himself was guilty of contributory negligence in that he carelessly and negligently drove and operated the forklift so as to cause the accident.[5] At the first trial a jury returned a verdict for defendant. The court granted a new trial on the ground of the insufficiency of the evidence to support the verdict.[6] The order granting a new trial was affirmed on appeal. (*Gyerman* v. *United States Lines Company,* 2 Civ. 31209, filed March 25, 1968, certified for nonpublication.)

The appellate court rejected defendant's threefold contention that the trial court had abused its discretion in granting a new trial because (1) there was no evidence of defendant's negligence, (2) there was no evidence that any negligence of defendant was a proximate cause of plaintiff's injury, and (3) the evidence established that plaintiff was contributorily negligent as a matter of law. In its opinion, the Court of Appeal set forth the conversation between plaintiff and Noel, defendant's employee. It also referred to defendant's statutory duty as an employer, under Labor Code sections 6302, 6304, and 6400-6404,[7] to furnish plaintiff a safe place to work,

---

[5]Defendant United States Lines also cross-complained against plaintiff, his employer (Associated Banning) and his employer's workmen's compensation insurance carrier (Argonaut Insurance Company). Defendant alleged that Associated Banning was negligent in failing to provide plaintiff with a safe place to work, and that the employer and insurance company had expended funds to reimburse plaintiff for medical and disability benefits for which it could assert subrogation rights against plaintiff should he recover in this action. This appeal raises no issues relevant to the cross-complaint.

[6]In its specification of reasons, the court stated: "The evidence clearly established that defendant United States Lines Company was guilty of negligence in the operation, maintenance and control of its warehouse, the place wherein plaintiff was injured, and such negligence was the sole proximate cause of plaintiff's injuries. Having control of the warehouse, it caused cargo to be stored therein in a negligent manner. Stacks of cargo were maintained in an unstable condition and in such a manner as to endanger any longshoreman required to handle the same in the usual and customary manner. The evidence discloses that plaintiff, as a longshoreman, attempted to handle such cargo in the usual manner and in doing so conducted himself in every respect as a reasonable and prudent man would have done under the circumstances existing at the time of the accident. The evidence does not support any claim of contributory negligence on the part of the plaintiff. Negligence of the defendant United States Lines Company was the sole proximate cause of the accident and plaintiff's injuries and plaintiff himself was not guilty of any negligence proximately contributing to the happening of the accident or the injuries sustained by him. For that reason the evidence does not justify the verdict of the jury and a new trial is required on that ground."

[7]Sections 6302 and 6304 define "place of employment" and "employer," respectively. Section 6400 provides that, "Every employer shall furnish employment and a place of employment which are safe for the employees therein." Section 6401 defines the employer's duty to furnish and use safety devices and safeguards; section

and found abundant evidence that defendant had breached its duty to plaintiff by using a method of pallet-stacking which violated section 3256, subdivision (b) of the General Safety Orders of the Division of Industrial Safety.[8] The Court of Appeal concluded that, "Although there was some evidence from which there might arise a whisper of contributory negligence on respondent's part, that hint of contributory negligence cannot be converted into negligence upon his part as a matter of law."

On retrial, it was stipulated by the parties that the matter could be heard by the court sitting without a jury on the transcript of the first trial. After considering the pleadings, the transcript and the arguments of counsel, the trial court found in substance that defendant negligently maintained and stored the fishmeal cargo in a dangerous and unsafe condition "which was a proximate cause of plaintiff's injuries"; that it was plaintiff's duty to stop work immediately when he encountered an unsafe condition and report it to his own supervisor; that plaintiff encountered what he considered to be an unsafe condition for four days prior to his accident but "failed to report these conditions to his own supervisor, even though he had contact with his supervisor daily, and in so failing to report the condition he violated a duty of care owed for his own protection, which violation amounted to the failure to use ordinary care, and which failure was the proximate cause of his injuries"; and that the condition "was not impossible to correct" and there was no reason to excuse plaintiff from failing to perform his duty of care for his own protection.

The court concluded that defendant was negligent and that its negligence was the proximate cause of plaintiff's injuries; that plaintiff was contributorily negligent and "that his contributory negligence was the proximate cause of [his] injuries"; and that defendant was entitled to judgment.[9] Judgment was entered accordingly. This appeal followed.

Only plaintiff's contributory negligence is at issue on this appeal. Plain-

6402 provides that no employer shall require or permit an employee to be in any unsafe place; section 6403 provides that no employer shall fail or neglect to use safety devices and safeguards, adequate methods and processes, and to do every other thing reasonably necessary to protect the life and safety of his employees; and section 6404 enjoins an employer from occupying or maintaining any unsafe place of employment.

[8]"Material, wherever stored, shall be piled, stacked, or racked in a manner designed to prevent it from tipping, falling, collapsing, rolling or spreading. . . ." (Cal. Admin. Code, tit. 8, part 2, former § 3256, subd. (b), now renumbered as 3241, subd. (c).)

[9]In his objections to the findings, plaintiff requested, but was refused, findings that his supervisor "merely kept his time records and did not actually supervise plaintiff's work and that plaintiff took all of his instructions and directions with respect to the performance of his work from defendant's supervisor whom he notified of the unsafe condition which he observed."

tiff challenges the adverse judgment on this point on the grounds that (1) the trial judge ignored the doctrine of law of the case, (2) defendant was estopped from asserting plaintiff's contributory negligence, and (3) defendant failed to sustain its burden of proving plaintiff's contributory negligence.[10]

### 1. *The Law of the Case*

The opinion in the first appeal does not, as plaintiff urges, foreclose subsequent determination of contributory negligence by operation of the law of the case doctrine. As stated by Witkin, "The doctrine of 'law of the case' deals with the effect of the *first appellate decision* on the subsequent *retrial or appeal*: The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case." (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 633, p. 4552, original italics; see *Tally* v. *Ganahl* (1907) 151 Cal. 418, 421 [90 P. 1049].) But, the "discussion or determination of a point not necessary to the disposition of a question that is decisive of the appeal is generally recorded as obiter dictum and not as the law of the case." (*Stockton Theatres, Inc.* v. *Palermo* (1956) 47 Cal.2d 469, 474 [304 P.2d 7].) "It is fundamental that the point relied upon as law of the case must have been *necessarily involved* in the case." (Witkin, *supra,* § 647, p. 4564, original italics.)

In the case at bench, the first appeal by defendant unsuccessfully challenged the order granting plaintiff a new trial. In affirming that order, it was necessary for the Court of Appeal to determine only that the trial court had not abused its discretion. If it had concluded that plaintiff had been contributorily negligent as a matter of law, then it would have been obliged to reverse the new trial order. But the Court of Appeal held that plaintiff could not be considered contributorily negligent *as a matter of*

---

[10]Plaintiff also contends that the judgment permits an assumption of the risk defense to a safety order violation, contrary to *Finnegan* v. *Royal Realty Co.* (1950) 35 Cal.2d 409, 430-441 [218 P.2d 17]. However, defendant never urged the assumption of the risk defense, nor would it apply to the instant case. Plaintiff is not charged with accepting a known risk created by defendant's conduct, but rather with violating a duty of care to himself by his own omission. In assumption of the risk the negligent party's liability is negated by the injured party's voluntary and knowledgeable acceptance of a risk. The contributory negligence defense bars recovery by the injured party not because of consent, but rather because he, too, has breached a duty of due care which proximately caused the injury. (*Grey* v. *Fibreboard Paper Products Co.* (1966) 65 Cal.2d 240, 245-246 [53 Cal.Rptr. 545, 418 P.2d 153]; *Vierra* v. *Fifth Avenue Rental Service* (1963) 60 Cal.2d 266, 270-271 [32 Cal.Rptr. 193, 383 P.2d 777]; *Prescott* v. *Ralphs Grocery Co.* (1954) 42 Cal.2d 158, 161-162 [265 P.2d 904].)

*law.* (See, e.g., *M & M Transport* v. *Cal. Auto Transport* (1955) 43 Cal.2d 847, 850-851 [279 P.2d 13]; *Anthony* v. *Hobbie* (1945) 25 Cal.2d 814, 818 [155 P.2d 826].)

In other words, the decision on the first appeal left the issue of contributory negligence for the determination of the trier of fact upon retrial, holding that the evidence was not so clear that reasonable men could not reach different conclusions. Indeed, the Court of Appeal's statement that "there was some evidence from which there might arise a whisper of contributory negligence on [plaintiff's] part" lends support to this interpretation. Although the record included *some* evidence of contributory negligence, it was not sufficient to support a conclusion that the trial court abused its discretion in ordering a new trial. Therefore the judge on retrial, as the trier of fact, was free to decide the issue of contributory negligence as it appeared to him, regardless of the identity of the record in the two trials.

## 2. *Estoppel to Assert Contributory Negligence*

Plaintiff next contends that defendant should be estopped from asserting contributory negligence as a defense because its marine clerk, Noel, misled plaintiff by informing him that nothing could be done about the dangerous condition of the palletized cargo. But this contention is raised for the first time on appeal and was not a part of the theory on which the case was tried. Plaintiff did not claim in the trial court that he was misled by Noel's statement and he "is not permitted to change his position . . . on appeal." (*Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715].) Plaintiff seeks to bring himself within the exception to this rule which permits a change of theory if "a question of law only is presented on the facts appearing in the record . . . ." (*Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 341 [303 P.2d 738]; see also *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].) We have said that the "existence of an estoppel is generally a question of fact for the trial court whose determination is conclusive on appeal unless the opposite conclusion is the only one that can be reasonably drawn from the evidence. [Citation.] When the evidence is not in conflict and is susceptible of only one reasonable inference, the existence of an estoppel is a question of law. [Citation.]" (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305-306 [61 Cal.Rptr. 661, 431 P.2d 245].) The crucial fact upon which plaintiff must base his estoppel argument is his purported conversation with Noel, defendant's employee, but all of the facts pertinent to that conversation were strongly disputed at trial.[11] Under the circumstances, we cannot conclude that as a matter

---

[11]Although counsel for defendant conceded at oral argument before us that the trial court had apparently accepted plaintiff's version of his conversation with Noel

of law defendant should be held estopped from asserting the defense of contributory negligence. To that defense we now direct our attention.

### 3. *Contributory Negligence*

■ As we have already pointed out, the trial court essentially found that (1) defendant negligently maintained and operated its warehouse by storing fishmeal sacks in a dangerous and unsafe condition and (2) plaintiff himself, upon encountering this condition, was negligent in failing to report it to his own supervisor and that such "failure was the proximate cause of his injuries."[12] The court further found that the unsafe condition "was not impossible to correct." The nucleus of the court's decision then was that plaintiff's failure to report was a proximate cause of his injuries because if he had reported it, the condition would have been corrected. Plaintiff contends that in the light of all the evidence indicating that the condition could not be corrected and in the absence of any evidence to the contrary, defendant failed to sustain its burden of proof as to both contributory negligence and proximate cause.

■ "Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm." (Rest. 2d Torts (1965) § 463; see Prosser, Torts (4th ed. 1971) § 65, pp. 416-417.) ■ The question of contributory negligence is ordinarily one of fact for the determination of the trier of fact. (*Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465, 473 [85 Cal.Rptr. 629, 467 P.2d 229]; *Gray* v. *Brinkerhoff* (1953) 41 Cal.2d 180, 183-184 [258 P.2d 834].) ■ "A plaintiff is required to exercise only that amount of care which

(see fn. 3, *ante*), counsel, of course, did not concede that the trial court had concluded that defendant had been estopped. Since estoppel was not part of the theory of the case at trial, the trial court cannot be deemed to have had it in mind in connection with the disputed testimony and counsel cannot be regarded as having made a broader concession than the memorandum of decision indicated.

[12]Although the court made no express finding that plaintiff reported this condition to defendant's chief marine clerk, Noel, our reading of the findings in conjunction with the court's extensive minute order of June 5, 1970, directing preparation of the findings, convinces us that the trial judge believed that the conversation between plaintiff and Noel had transpired as plaintiff testified. In discussing plaintiff's duty in the detailed minute order, which is actually a memorandum of decision, the trial judge explained that plaintiff "should have reported [the unsafe condition] to his superior and not 'do the best he can' as advised by his non-superior, the marine clerk." While a memorandum of decision cannot be used to impeach the court's findings, it can be used to explain them. (*McBain* v. *Santa Clara Sav. & Loan Assn.* (1966) 241 Cal.App.2d 829, 840 [51 Cal.Rptr. 78]; see also *Oldis* v. *La Societe Francaise* (1955) 130 Cal.App.2d 461, 471-476 [279 P.2d 184].)

would be exercised by a person of ordinary prudence in the same circumstances." (*Werkman* v. *Howard Zink Corp.* (1950) 97 Cal.App.2d 418, 421 [218 P.2d 43].) █ Where a person must work under possibly unsafe or dangerous conditions, the amount of care he must exercise for his own safety may well be less than would otherwise be required by reason of the necessity of his giving attention to his work. (*Pike* v. *Frank G. Hough Co., supra,* 2 Cal.3d at p. 473; *Austin* v. *Riverside Portland Cement Co.* (1955) 44 Cal.2d 225, 239 [282 P.2d 69].) The burden of proving that the plaintiff was negligent and that such negligence was a proximate cause of the accident is on the defendant. (*Anthony* v. *Hobbie, supra,* 25 Cal.2d at p. 818; *Gett* v. *Pacific G. & E. Co.* (1923) 192 Cal. 621, 631 [221 P. 376]; Rest. 2d Torts, § 477.)

█ In the instant case, absent evidence of the contract governing plaintiff's employment and of the custom and practice affecting stevedoring, we doubt that the record would provide evidentiary support for the finding that plaintiff violated a standard of due care for his own safety. Considered in the light of the realities of his working life (see *Austin* v. *Riverside Portland Cement Co., supra,* 44 Cal.2d at p. 239), the laborer's duty may become considerably restricted in scope. In some instances he may find himself powerless to abandon the task at hand with impunity whenever he senses a possible danger; in others, he may be uncertain as to which person has supervision of the job or control of the place of employment, and therefore unsure as to whom he should direct his complaint; in still others, having been encouraged to continue working under conditions where danger lurks but has not materialized, he may be baffled in making an on-the-spot decision as to the imminence of harm. All of these factors enter into a determination whether his conduct falls below a standard of due care.

In the case before us the standard of due care required of laborers in general is explicated by evidence of duty imposed by contract and by custom upon the particular type of laborer involved. Custom alone, of course, does not create the standard of proper diligence. "Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure . . . ." (*The T. J. Hooper* (2d Cir. 1932; Hand, L., J.) 60 F.2d 737, 740, cert. den. *sub nom. Eastern Transportation Co.* v. *Northern Barge Corp.,* 287 U.S. 662 [77 L.Ed. 571, 53 S.Ct. 220]; see *Complete Serv. Bur.* v. *San Diego Med. Soc.* (1954) 43 Cal.2d 201, 214 [272 P.2d 497]; Prosser, Torts, *supra,* § 33, pp. 166-168.)[13] █ Never-

---

[13]In *Pauly* v. *King* (1955) 44 Cal.2d 649, 655 [284 P.2d 487], quoting *Owen* v. *Rheem Mfg. Co.* (1947) 83 Cal.App.2d 42, 45 [187 P.2d 785], we said: " 'Failure to observe custom may be evidence of negligence, but the standard is not fixed by

theless, although custom does not fix the standard of care, evidence of custom is ordinarily admissible for its bearing upon contributory negligence. (*Fowler* v. *Key System Transit Lines* (1951) 37 Cal.2d 65, 68 [230 P.2d 339]; 2 Harper and James, Torts (1956) § 173, pp. 977-978.)

In the case at bench, the fact that a longshoreman faced with a safety hazard would generally report it to his own supervisor and would thereafter proceed with the job only as further directed by his superior suggests that plaintiff should have been more diligent in registering his complaint. Furthermore, the collective bargaining agreement under which plaintiff worked (see fn. 3, *ante*) and with which he was familiar indicates that a longshoreman had a significant amount of responsibility in respect to the reporting of unsafe working conditions. Testimony corroborates an interpretation of this contract as giving the longshoreman an absolute right to stop work if there is a safety hazard, and, by complaining to his steward, to set in motion the arbitration process.[14] Plaintiff testified that he complained only to Noel "[b]ecause he was the only one there acting on part of supervision"; nevertheless his justification in relying on Noel's response was ultimately a question of fact appropriately left to the trier of fact (*Meloy* v. *Texas Co.* (1953) 121 Cal.App.2d 691, 700 [263 P.2d 897]). Although the unsafe condition in the storage of the fishmeal was created by defendant's employees, in view of the foregoing evidence we conclude that there is sufficient support in the record for the finding that plaintiff failed to use ordinary care for his own protection.

We must now inquire whether defendant sustained its burden of establishing that plaintiff's failure to report the unsafe condition was a "legally contributing cause . . . in bringing about the plaintiff's harm." (Rest. 2d Torts, § 463.) As previously noted, the trial court appears to have deter-

---

custom. The standard is always due care. The presence or absence of custom does not alter that standard. Custom may assist in the determination of what constitutes due care. What others do is some evidence of what should be done, but custom is never a substitute for due care.' "

[14] The contract here at issue does not represent management's attempt either to exculpate itself from liability for workers' injuries (cf. *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92, 95 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]) or to delegate the duty to furnish a safe place to work (cf. *Morehouse* v. *Taubman Co.* (1970) 5 Cal.App.3d 548, 558 [85 Cal.Rptr. 308]). Rather, it sets up an orderly procedure for recognition and handling of safety problems from which a duty on the longshoreman to report such conditions may be implied. Although many contracts between employer and employee relating to injury in the course of employment are not given effect, the reasons for that result, unequal bargaining power and economic necessity (Rest. 2d Torts, § 496B(b)), patently do not exist in the instant situation.

mined that plaintiff's failure was a proximate cause of his injuries because if plaintiff had reported the condition it would have been corrected.[15]

On this issue the positions of the parties may be summarized thusly: Plaintiff argues that the burden was on defendant to prove that if plaintiff *had* reported the condition to his own supervisor instead of to defendant's supervisor, the condition would have been corrected or made safer. Defendant asserts that it was not incumbent upon it to prove that the condition complained of was correctable and that in any event there is evidence supporting the trial court's finding.

The burden of proof rests on each party to a civil action as to each fact essential to his claim or defense (Evid. Code, § 500). A party claiming a person failed to exercise due care has the burden of proof on that issue (Evid. Code, § 521). ■ The burden of proving all aspects of the affirmative defense of contributory negligence, including causation, rests on the defendant (*Anthony* v. *Hobbie, supra,* 25 Cal.2d at p. 818; *Gett* v. *Pacific G. & E. Co., supra,* 192 Cal. at p. 631; Rest. 2d Torts, § 477), unless the elements of the defense may be inferred from the plaintiff's evidence. (*Blanton* v. *Curry* (1942) 20 Cal.2d 793, 804 [129 P.2d 1].) The burden must be met by more than conjecture or speculation (*Reese* v. *Smith* (1937) 9 Cal.2d 324, 328 [70 P.2d 933]; Prosser, *Proximate Cause in California* (1950) 38 Cal.L.Rev. 369, 381.) Merely because plaintiff asserts that his own negligence, if any, could not have caused his injury, does not shift to him the burden of proof on the issue. Otherwise denial of any essential element of the defense case would shift the burden of proof on that issue to the plaintiff.

■ "The plaintiff's negligence is a legally contributing cause of his harm if, but only if, it is a substantial factor in bringing about his harm and there is no rule restricting his responsibility for it." (Rest. 2d Torts, § 465(1).) The rules determining this causal connection between the plaintiff's negligence and his harm are the same as those determining the causal relation between the defendant's negligence and the harm resulting to

---

[15]Immediately after the court's finding that such "failure was the proximate cause of his injuries" appears the following finding: "The condition of which the plaintiff complains was not impossible to correct, and, that there was no reason to excuse the plaintiff from failing to perform his duty of care owed for his own protection."

In his memorandum of decision, the court stated, "Had [plaintiff] performed his duty and brought [the unsafe condition] to the attention of his superior, it may well be that the simple device of having ladders brought in to remove the offending 100-pound bags, or other jitney drivers to remove the bags one at a time, instead of attempting to remove them by two pallet boards at a time, could well have corrected the condition with a minimum risk to the plaintiff . . . ."

others. (Rest. 2d Torts, §§ 465(2), 430, 431; Prosser, Torts, *supra*, § 65, p. 421.)

The fundamental question, then, is whether the plaintiff, as "the negligent actor has so produced the harm to himself . . . for which he is sought to be held responsible . . . as to make the law regard his conduct as the cause of the harm . . . ." (Rest. 2d Torts, pp. 425-426.) His "conduct must be a substantial factor operating with the defendant's negligence in bringing about the plaintiff's harm . . . ." (Rest. 2d Torts, § 465, com. b); that is, it must have "such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility . . . ." (Rest. 2d Torts, § 431, com. a.)

■ We turn now to the facts of the case before us. It is obvious, of course, from what we have said that plaintiff did not create or maintain the dangerous and unsafe conditions of storage. The trial court found upon substantial evidence that defendant negligently maintained and operated its warehouse under those conditions. It was defendant who had control of the cargo and directed its disposition and high stacking throughout the warehouse. Defendant alone created this risk of harm which materialized in the toppling of the stacks.

Nor did the trial court find that plaintiff was negligent in his operation of the forklift[16] or in his "breaking down" the particular stack of fishmeal whose sacks fell from the top of the load and injured him. In short there is no finding that any negligent conduct of plaintiff, operating with defendant's negligence, brought about the shifting and eventual dislodging of the sacks. According to the trial court's findings, plaintiff's negligence consisted solely in *his failure to report* the dangerous condition to his own supervisor. Our task then is to find in the record evidence showing, or from which it can be reasonably inferred, that this omission was a substantial factor in bringing about plaintiff's harm.

Defendant's theory of causation is that if plaintiff had reported the dangerous condition to his Associated Banning supervisor, that firm would have made the condition safer. An examination of the record, however, discloses no evidence establishing this theory. Indeed, although defendant vigorously asserts that the record supports a finding of proximate cause, it points to only one page of the extensive record for such evidence. At this part of the record, defendant's witness Hargett responded on direct

---

[16]This was the only allegation of contributory negligence. (See text accompanying fn. 5, *ante.*)

examination to a question about what a longshoreman should do upon encountering an unsafe condition. Hargett replied that he would have to get another lot to work on or "have supervision called, . . . and we would have sent men there to take care of the situation, if he was in such a condition he couldn't operate."

In our view this testimony does not show that the stacks would have been made safer. Although it indicates that the problem would have received immediate attention, it provides no clue as to what, if anything, could have been done to break down the stacks of fishmeal more safely than by the use of forklifts. Indeed, other than the vague statement as to sending "men there to take care of the situation" no evidence at all was offered as to specific measures that would be taken. Nor does evidence as to the existence of a grievance procedure, formalized in the ILWU-PMA contract (see fn. 4, *ante*) constitute proof that in the particular situation culminating in plaintiff's injury, steps would have been taken to make the situation safer. Finally the trial court's suggestions made in its memorandum of decision (see fn. 15, *ante*) that the offending bags could have been removed by using ladders or having other forklift drivers remove them one at a time are not based upon evidence in the record and therefore do not support the finding. Indeed such suggestions only point up the complete lack of defense evidence in the record on this critical issue. The record does not establish that plaintiff's failure to report the dangerous condition was a substantial factor in bringing about the fall of the sacks.

In view of the foregoing we conclude that defendant did not meet its burden of proving that plaintiff's contributory negligence was a proximate cause of his injuries.

■ "The appellate courts have power to order a retrial on a limited issue, if that issue can be separately tried without such confusion or uncertainty as would amount to a denial of a fair trial. [Citations.] Whether it can or not depends upon the circumstances of each case." (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801 [197 P.2d 713]; see also *Templeton Feed & Grain* v. *Ralston Purina Co.* (1968) 69 Cal.2d 461, 469 [72 Cal.Rptr. 344, 446 P.2d 152]; *Little* v. *Superior Court* (1961) 55 Cal. 2d 642, 645 [12 Cal.Rptr. 481, 361 P.2d 13].)

The issue of plaintiff's contributory negligence is separate and distinct from that of defendant's negligence. Although there are two aspects of the former issue, namely the question whether plaintiff was himself negligent and the question whether such negligence, if any, was a proximate cause of the accident, we are not satisfied that in the instant case they are so separate and distinct that the issue of proximate cause can be separately

tried "without such confusion or uncertainty as would amount to a denial of a fair trial," especially if it were tried to a jury. In the presentation of evidence on the issue of contributory negligence, the line of demarcation between these two aspects frequently becomes blurred. (See Rest. 2d Torts, § 463.)

The issue of defendant's negligence has been properly determined and we see no reason why it should be relitigated. Retrial should be had on the issue of plaintiff's contributory negligence (including the issue of whether such negligence, if any, was the proximate cause of the accident) and, if such issue is resolved favorably to plaintiff, on the issue of damages.

The judgment is reversed and the cause is remanded with directions for a new trial limited to the issues of plaintiff's contributory negligence and of damages. Each party shall bear his or its own costs on appeal.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., and Burke, J., concurred.