Filed 4/25/16  Will v. Caterpillar, Inc. CA6
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DIANA WILL et al.,<br><br>   Plaintiffs and Respondents,<br><br>   v.<br><br>CATERPILLAR, INC.,<br><br>   Defendant and Appellant. | H039372<br>(Monterey County<br>Super. Ct. No. M101755) |

Decedent Trysten Matthew Will was operating a bulldozer on a steep hillside in an attempt to extricate his partner's bulldozer which had become stuck on that hill.  Will's bulldozer tipped over and rolled down the hill approximately 150 feet before coming to rest in a ravine.  Will suffered a fatal head injury in the accident.  His widow, Diana, filed a lawsuit on behalf of herself and their two children (hereafter collectively respondents) against the bulldozer's manufacturer, appellant Caterpillar, Inc. (Caterpillar), alleging the bulldozer in question was negligently designed and a substantial factor in Will's death.  A jury found Caterpillar liable and awarded respondents damages in the amount of $4,760,203.78.

On appeal, Caterpillar argues the trial court erred:  (1) by instructing the jury on the "sudden emergency" doctrine under CACI No. 452 and on "employment under dangerous conditions" under CACI No. 415 despite uncontroverted evidence Will put himself into the situation which led to his death; (2) by denying Caterpillar's motion for judgment notwithstanding the verdict even though respondents' experts testimony was

insufficient to support the design defect theories proffered by respondents; (3) by denying Caterpillar's motion for a new trial due to the improper admission of speculative testimony from respondents' experts; and (4) by denying Caterpillar's motion to exclude evidence of respondents' pension benefits.

We find no merit to any of Caterpillar's arguments and will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The accident and complaint*

At the time of his death, Will was employed by the California Department of Forestry and Fire Protection (Cal Fire) as a heavy fire equipment operator. On October 8, 2007, Will responded to a wildfire in Palo Colorado Canyon in Monterey County.

Will and another bulldozer operator, Casey Emerson, were tasked with cutting a fire line on a hill on one side of the fire. Emerson's bulldozer became stuck on the hillside, and Will told him he would return to help. Emerson buried the blade of his bulldozer into the dirt to make it more stable, then got out and waited for Will to return. Once Will got back to Emerson, he attempted to "cut . . . a flat bench" in front of Emerson's bulldozer so that he could drive the bulldozer safely down the hill. In the process of cutting that bench, Will's bulldozer slipped, slid down the hill and rolled over once or twice to the bottom of the ravine. Will's head impacted a hard surface inside the cab of his bulldozer, killing him.

Respondents brought a civil action, alleging general negligence and product liability causes of action against Caterpillar for the fatal injuries Will suffered while operating the bulldozer.

### B. *Relevant pretrial motions*

During discovery, Caterpillar filed a motion to compel production of documents held by Will's employer, Cal Fire. Specifically, Caterpillar sought documents and information regarding Cal Fire's investigation of the accident and the working recommendations prepared by Cal Fire's serious accident review team (SART).

2

According to Caterpillar, Cal Fire's investigation and subsequent reports likely showed the probable cause and contributory factors regarding the accident, as well as Cal Fire's critique of its employees' actions. Caterpillar argued the discovery was also relevant to its defense against the lien claim brought against by Cal Fire.

In its opposition, Cal Fire claimed its working recommendations were confidential and protected from disclosure by the official information privilege of Evidence Code section 1040, subdivision (b)(2). The trial court agreed with Cal Fire and denied Caterpillar's motion to compel.

Just before trial, the parties brought various in limine motions.[1] Respondents moved for orders excluding evidence of: (1) collateral source payments (including Will's pension payments); (2) Cal Fire's SART investigation report; (3) Cal Fire's preincident report regarding the bulldozer's safety equipment and maintenance; and (4) Cal Fire's postincident report regarding training for bulldozer operators.

Caterpillar brought the following relevant in limine motions: (1) an order limiting the testimony of Dr. John Hain, who performed Will's autopsy, to opinions formed at the time of the autopsy and excluding new opinions formed for purposes of litigation; and (2) an order excluding nonretained expert witnesses disclosed in respondents' supplemental expert designation.

The trial court granted respondents' motions regarding the postincident report and Cal Fire's SART report, but denied their motion to exclude the Cal Fire preincident report. It also granted Caterpillar's motion regarding Dr. Hain, but denied its request for an order excluding the nonretained expert witnesses disclosed in respondents' supplemental designation. After receiving supplemental briefing from the parties, the court eventually granted respondents' motion excluding evidence of collateral source

---

[1] Not all of the parties' various in limine motions are relevant to the issues argued on appeal, therefore we list only those that are.

3

payments, but allowed Caterpillar to cross-examine respondents' expert, Robert Johnson, and, further, left open the issue of possibly allowing evidence of disability payments.

### C.    *Evidence regarding the accident*

The underlying accident involved a bulldozer manufactured by Caterpillar, specifically a D6N track-type tractor, which was equipped with a rear forestry screen and a lap belt restraint. Cal Fire assigned Will to the D6N bulldozer, but had not trained him on its use. He normally was assigned to an older model, a Caterpillar D6C, which was equipped with standard steering clutches, foot-controlled brakes, a straight blade, and flat tracks.

Cal Fire was aware its bulldozer operators needed training on the D6N because of its differential steering system. The D6N bulldozer had a tiller-bar and a "joy stick" style control, with high tracks and controls to angle its blade. With even minor or subtle errors in its operation, accidents could occur, especially because of the way Cal Fire used these vehicles in fighting wildfires.

The area at which the accident occurred consisted of a steep, sandy slope, which measured approximately 83 percent.[2] After cutting a fire line along the top of a ridge, Will and Emerson began to descend the steep hillside, where Emerson's bulldozer began to slide before becoming stuck. Will, who was in front of Emerson, could not reverse his bulldozer to assist, because of the loose soil and steepness of the slope. So he continued down the slope, intending to drive back around. A firefighter observed Will having difficulty and losing traction on the steep slope, so he assisted Will in finding a pathway down the hill.

---

[2] Given the soil conditions, one of Caterpillar's experts testified he would not try to build a bench with a slope of greater than 25 percent because of the likelihood he would lose control of his machine. Cal Fire policy for operating bulldozers allows for a 45 percent maximum side slope.

4

After reaching the bottom, Will elected to try and get Emerson's bulldozer free. His supervisor told him to be careful in doing so, and told him it was okay for Emerson's bulldozer to roll down the hill, so long no one was in it. When Emerson told Chief DiTullio he was stuck, DiTullio offered to "send a different bulldozer" but Emerson asked for Will instead because "[Will] knew where [he] was and how to get back to [him]."

Will and Emerson discussed their plan for extricating Emerson's bulldozer and Will started cutting a "bench," or level area, beneath it. Will and Emerson opted not to try the winch on Emerson's bulldozer[3] because the line was frayed. Once the bench was complete, Emerson would be able to drive his bulldozer onto it safely, then proceed down the hill. In the process, Will's bulldozer slipped, twice, on the side slope. Emerson saw that Will's bulldozer was in a precarious position and waved his arms to alert Will about the hazard, but it was too late. Will's bulldozer slipped backwards and rolled over 150 feet down the slope before landing in a rock ravine. Will was not wearing his helmet and suffered fatal injuries.

Respondents' forensic pathologist, Dr. John Hain, testified the cause of Will's death "was a blunt force impact of the head against a hard, elongated, angulated surface." Although the precise point of impact inside the cab could not be determined, it was "undisputed that [Will] died from a head wound caused by a hard metal object during a rollover incident" and there were many objects inside the cab against which Will could have struck his head.

---

[3] Will's bulldozer was not equipped with a winch. It was undisputed that it was the operator's responsibility to check—and if necessary, replace—the winch, before operating the equipment in the field.

5

### D. *Evidence regarding design defect and damages*

Respondents presented their theories of liability, based on alleged design defects in the Caterpillar D6N track-type tractor.

Respondents offered into evidence a patent application, in which Caterpillar wrote, "earth moving vehicles are frequently operated on steep hills, wherein lateral tipping and rolling over is a real danger" and one would "expect" "a rollover" "in this type of vehicle, operating in those types of environments." Caterpillar's technical steward for seats and restraints, John Spangler, testified the reason for "rollover protective system[s]" (ROPS) is that bulldozers have a "reasonable chance of rolling over" and the "purpose of the ROPS is to protect the occupant from serious injury or death in the event of a rollover."

Respondents presented evidence of different safety features Caterpillar had patented in the 1970s: (1) A four-point restraint to prevent movement of the upper torso; (2) airbags; and (3) side bolsters. Respondents' engineering expert, Steven Meyer, explained, it is "clear" that because of bulldozers' "geometry," "configuration," and "the proximity of the interior structure, an upper torso restraint is *absolutely necessary*." (Italics added.) A "lap belt only safety system" was "defective" because, as respondents' biomechanical engineer, Dr. Jacqueline Paver, explained, whether Will hit his head on "the flange or the pillar," the "system allowed him to sustain a fatal [head] injury." With only a lap belt restraint system, Will was "allow[ed] . . . to move around the bulldozer" and "hit those unfriendly surfaces," causing his fatal injury.

Respondents' experts testified that either a four-point restraint, or a three-point restraint combined with other safety features, would have prevented Will's injury. Meyer testified a four-point seatbelt "would have protected [Will] and it would have prevented his death in this case." Meyer also noted a three-point restraint was "better than what we had here," and could have been combined with side bolsters or air bags to prevent Will's injuries.

6

On air bags, Meyer explained: "The air bag system . . . I am not suggesting that we had to go that far in this bulldozer. Certainly could have but I am not suggesting that's what was required. I think we needed an upper torso restraint, and four-point restraints would be a good conclusion. What I see [in] the '74 Caterpillar patent, is that back in '74 they were demonstrating patent [*sic*] air bags to provide side impact protection in the rollover."

Caterpillar's expert, Dr. William Scott, testified that a three-point or even a four-point harness would be dangerous because in a rollover accident, those harnesses would interact with the neck causing serious or fatal injuries. He further testified that placing airbags inside a bulldozer cab would also be impractical because it would increase the risk to the occupant if it deployed inadvertently, as well as the danger associated with placing a large pyrotechnic device (used to deploy and rapidly inflate an airbag) in a vehicle being used to fight fires.

With respect to side bolsters, Dr. Scott testified that they would not have prevented fatal injuries in this accident since the bulldozer rolled end over end, causing Will to come forward out of his seat rather than to the side. It was Dr. Scott's conclusion that, based on his biomechanical evaluation of the "kinematics of [this accident]," there was no "reasonable" protective structure that could be installed in this vehicle that would have made the accident survivable.

During his testimony, Spangler admitted Caterpillar did not "know, one way or another, whether a multi-point restraint would work in a track-type tractor because [it] [had] never tested it." Spangler also admitted Caterpillar did not know if, under "the current two-point seat belt" configuration, "an operator's head can strike the fixed post inside the cab" as it had never "done that analysis." According to Spangler, there was "no economic reason why Caterpillar can't put a four-point restraint in a bulldozer."

Respondents' forensic economist, Robert W. Johnson, testified regarding the amount of lost earning capacity, based on his projected wages and benefits, along with

7

other damages respondents suffered as a consequence of Will's death. Johnson ultimately concluded the net present value of respondents' damages amounted to $5,593,274.

Caterpillar presented evidence from its expert, Laura Dolan, regarding respondents' damage claims. Dolan testified that respondents' damages were overstated and that several of Johnson's assumptions were not supported or were otherwise unreasonable.

### E.     *Jury instructions and verdict*

After the parties rested, the trial court instructed the jury with, among other instructions not relevant to this appeal, CACI No. 415 (regarding risks a job requires an employee to undertake) and CACI No. 452 (regarding what care is owed during sudden and unexpected emergency situations).

Eventually, after several questions from the jurors, the jury returned a verdict, but with inconsistent damages. The jury was instructed to return to deliberations and subsequently returned with a verdict in which it found Caterpillar strictly liable and negligent in its design of the bulldozer. Specifically, the jury found Caterpillar's design was a "substantial factor" in causing harm and that the "risks of the design" "outweigh[ed] the benefits."

The jury awarded respondents a total of $4,494,000 in economic damages and $2,208,334 in noneconomic damages. The jury further found, however, that both Will and Cal Fire were also negligent. It apportioned the percentage of responsibility as follows:  Caterpillar-67 percent; Will 27-percent; and, Cal Fire-6 percent.

### F.     *Posttrial motions*

Caterpillar brought several posttrial motions, including a motion for judgment notwithstanding the verdict (JNOV) and a motion for new trial.

Caterpillar's JNOV motion argued there was no evidence showing its purportedly defective design was a substantial factor in causing Will's death, and that there was no

8

evidence to prove respondents' alternative design theories were either suitable or would have prevented his death. Caterpillar's new trial motion raised these same arguments, but also contended that it was entitled to a new trial because the trial court gave erroneous jury instructions, i.e., CACI Nos. 415 and 452, that minimized or excused Will's standard of care. Further, the trial court made several erroneous and prejudicial evidentiary rulings which warranted a new trial.

Respondents opposed the motions and, following argument, the trial court denied them. The trial court entered judgment on the jury's verdict on October 29, 2012 and entered an amended judgment on March 12, 2013.[4]

## II.  DISCUSSION

### A.  *Instructional error*

Caterpillar argues it is entitled to reversal because the trial court improperly instructed the jury on the sudden emergency doctrine (CACI No. 452) and working in dangerous conditions (CACI No. 415). These two instructions essentially told the jury that Will had a lower duty of care in the situation which led to his death, even though he voluntarily chose to help Emerson extricate his bulldozer.

#### 1.  *Standard of review*

The Court of Appeal performs a two-part review in determining whether the trial court erred in instructing the jury. The court first reviews the adequacy of the instructions given, focusing on whether the trial court "fully and fairly instructed on the applicable law." (*People v. Partlow* (1978) 84 Cal.App.3d 540, 558.) If the court finds

---

[4] In a footnote, Caterpillar objects to the trial court's judgment, claiming it improperly provides for postjudgment interest to begin accruing on a date prior to entry of judgment. We decline to address this issue. Points on appeal must be stated under a separate heading summarizing the point. (Cal. Rules of Court, rule 8.204(a)(1)(B).) Footnotes are not the appropriate vehicle for stating contentions on appeal and issues raised in such a manner need not be considered. (*Evans v. Centerstone Development Co*. (2005) 134 Cal.App.4th 151, 160.)

error in the giving of the jury instructions, it next determines if that error was prejudicial. (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983.)

" '[P]arties have the "right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court." [Citation.] "A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented." ' " (*Freeze v. Lost Isle Partners* (2002) 96 Cal.App.4th 45, 52-53.) Viewing the evidence in a light most favorable to the party claiming instructional error applies both to whether there was error and, assuming error, whether such error was prejudicial. (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 655.)

Where instructional error is found, a judgment in a civil case will not be reversed " 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' " (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*).) "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Ibid.*) In assessing whether instructional error is prejudicial, the court looks at "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580-581.)

The propriety of a jury instruction is a question of law that is reviewed de novo. (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82, citing *People v. Cole* (2004) 33 Cal.4th 1158, 1206.)

2. *Trial court's instructions to the jury*

In deciding to include CACI Nos. 415 and 452 when instructing the jury, the trial court informed counsel that: "[T]he jurors should make the decision about whether or not

10

[CACI Nos. 415 and 452] are appropriate. As you know, the court gives the instructions, but not all the instructions are going to be relevant. It depends on how they view the facts." The trial court also advised the attorneys that it decided to issue CACI No. 452 because, according to the instruction's use note, it is a factual question for the jury whether the conditions exist for applying the sudden emergency doctrine.

The trial court instructed the jury with the following tailored version of CACI No. 452: "[Respondents] claim that Matthew Will was not negligent because he acted with reasonable care in an emergency situation. Matthew Will was not negligent if [respondents] prove all of the following. That there was a sudden and unexpected emergency situation [*sic*] which someone was in actual or apparent danger of immediate injury; that Matthew Will did not cause the emergency; and that Matthew Will acted as a reasonably careful person would have acted in similar circumstances, even if it appears later that a different course of action would have been safer."

The trial court also instructed the jury with the following tailored version of CACI No. 415: "An employee required to work under dangerous conditions must use the amount of care for his own safety that a reasonably careful employee would use under the same conditions. In deciding whether Matthew Will was negligent, you should consider how much attention his work demanded. You should also consider whether Matthew Will's job required him to take risks that a reasonably careful person would not normally take under ordinary circumstances."

### 3. *CACI No. 452*

Caterpillar argues the trial court erred in giving CACI No. 452 because there was no evidence Will was faced with a sudden and unexpected emergency prior to his tractor overturning. During trial, Caterpillar elicited testimony that Will experienced problems himself maneuvering on the steep hillside where Emerson got stuck and required assistance from another firefighter on foot to reach the bottom before he could return to help Emerson. Emerson testified he rejected an offer to have a different bulldozer or an

11

excavator assist him because Will knew where he was and how to get back to him.  When Will returned to where Emerson was waiting, they talked about what to do and decided Will would bulldoze a bench on the hillside to give Emerson a flat area onto which he could drive his bulldozer.  Emerson further testified that, at the time they discussed their strategy, there were no visible flames near them though the fire was smoldering and "was not considered contained."

Under the sudden emergency doctrine, "a person who, without negligence on his part, is suddenly and unexpectedly confronted with peril, arising from either the actual presence, or the appearance, of imminent danger to himself or to others, is not expected nor required to use the same judgment and prudence that is required of him in the exercise of ordinary care in calmer and more deliberate moments." (*Leo v. Dunham* (1953) 41 Cal.2d 712, 714.)  "Whether the conditions for application of the imminent peril doctrine exist is itself a question of fact to be submitted to the jury." (*Damele v. Mack Trucks, Inc.* (1990) 219 Cal.App.3d 29, 37 (*Damele*).)

"An instruction on imminent peril should not be given unless at least two courses of action are available to the party after the danger is perceived." (*Anderson v. Latimer* (1985) 166 Cal.App.3d 667, 675.)  The rule is "properly applied only in cases where an unexpected physical danger is presented so suddenly as to deprive the [party] of his power of using reasonable judgment." (*Pittman v. Boiven* (1967) 249 Cal.App.2d 207, 216.)  "It is improper to give an instruction on sudden peril unless the litigant is suddenly and unexpectedly faced with a danger and to avoid that danger, took action which resulted in injury." (*Thompson v. Keckler* (1964) 228 Cal.App.2d 199, 213.)

Because a trial court cannot foresee whether a jury will, in fact, find that a particular plaintiff was responsible in some degree for his or her injuries, it is appropriate to give an imminent peril instruction where there is some evidence to support its application. (*Damele*, *supra*, 219 Cal.App.3d at pp. 35-37.)  In this case, the jury found that Will *was* comparatively negligent.  This would not have been the case had they

12

found the elements of CACI No. 452 had been met since that instruction tells them that Will was *not* negligent if he was confronted by a sudden emergency. Accordingly, the trial court did not err in giving this instruction.

### 4. *CACI No. 415*

Caterpillar further contends the trial court erroneously instructed the jury under CACI No. 415, thus leading the jury to hold Will to a lower duty of care based on his employment as a firefighter.

CACI No. 415 is intended for, and properly given, only in situations where a party is compelled as a condition of his or her employment to encounter a specific risk. (*Austin v. Riverside Portland Cement Co.* (1955) 44 Cal.2d 225, 239.) It "appears aimed at situations where the employment conditions lessen the plaintiff's ability to take precautions." (*Von Beltz v. Stuntman, Inc.* (1989) 207 Cal.App.3d 1467, 1485.) "Where a person must work under possibly unsafe or dangerous conditions, the amount of care he must exercise for his own safety may well be less than would otherwise be required by reason of the necessity of his giving attention to his work." (*Gyerman v. United States Lines Co.* (1972) 7 Cal.3d 488, 501.)

In this case, Caterpillar emphasizes the evidence demonstrating that Will was not required to take the risks he did, and that he voluntarily chose to return to the steep hillside to assist Emerson. While this is true, Will was a firefighter, assigned to combat a wildfire in the Palo Colorado Canyon. The jury could certainly consider the nature of Will's occupation and the conditions in which the accident occurred in evaluating the standard of care to which he should be held. Again, it was not error for the court to give this instruction.

### 5. *No prejudice from the instructions*

Even were we to assume that the trial court erred in giving either CACI No. 415 or CACI No. 452 in this case, Caterpillar has not shown that it was prejudiced by this error.

13

Again, in assessing whether instructional error is prejudicial, the court looks at four criteria: "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule*, *supra*, 8 Cal.4th at pp. 580-581.)

The first criterion to consider is whether the state of the evidence was evenly balanced, because prejudice from an erroneous instruction is more likely to alter the balance in such cases. In this case, however, the evidence was not closely balanced. There was ample evidence presented that Caterpillar's design of the rollover protection system in Will's was a substantial factor in his death and Caterpillar's own admissions that it did not consider or test alternative protection systems support the verdict.

The second criterion to consider is the effect of other instructions, which may mitigate or compound the impact of erroneous instructions. In this case, the trial court informed the jury that some instructions may not apply, and if so, to ignore the inapplicable instructions.[5] Since the jurors found that Will was comparatively negligent, for example, it is clear that they agreed with Caterpillar that he was not faced with a sudden emergency; otherwise, they would have found no negligence on his part as instructed by CACI No. 452.

The third factor for the court to consider is the effect of counsel's arguments in emphasizing the erroneous instruction to the jury. Respondents' counsel did not refer to either CACI No. 452 or CACI No. 415 in argument, although the idea of having two choices in an emergency situation was briefly discussed. Specifically, counsel sought to soften the impact of Caterpillar's argument that Will himself acted negligently, e.g., "[t]he idea of Matt Will being negligent while he was fighting this fire, while he was trying to help his friend, it's the ultimate Monday morning quarterbacking."

---

[5] "[Y]ou may find that some instructions do not apply. In that case follow the instructions that do apply and use them together with the facts to reach your verdict."

14

Respondents' counsel also argued the job was inherently dangerous, by saying "Cal Fire does a dangerous job. They put their lives on the line for us, they take that job on, and they do the best they can under the circumstances that they have." Counsel could have raised these same arguments even without CACI No. 452 and CACI No. 415.

The final criterion is whether there are indications the jury was misled by the instructions. Caterpillar refers to four juror declarations to support its claim that the instructions were confusing and caused them to assign less fault to Will and more fault to Caterpillar than they would have otherwise done. The declarations do not support this claim and do not reflect any confusion about these instructions. Rather the declarations, along with the questions submitted by jurors to the court during deliberations, point to the jurors' confusion about whether they needed to agree on noneconomic damages and how different jurors' evaluations of those damages should be reconciled. While some of the jurors, in their declarations, stated they believed that Will was solely responsible for his injuries, they do not assert that they, or any of the other jurors, could not understand how to apply the instructions at issue.

Accordingly, Caterpillar has not established prejudice.

B.     *The trial court properly denied the motion for JNOV*

Caterpillar argues the trial court should have granted its JNOV motion because the testimony of respondents' experts did not rise to the level of admissible evidence to support their design defect theories. Alternatively, Caterpillar contends the trial court's erroneous admission of the experts' speculative testimony warrants a new trial.

1.     *Caterpillar forfeited its objections to this evidence*

To the extent Caterpillar contends the trial court erred by permitting respondents' experts to proffer the testimony it claims was inadmissible, it has forfeited that claim by failing to object to that testimony below. "A party desiring to preserve for appeal a challenge to the admission of evidence must comply with the provisions of Evidence Code section 353, which precludes reversal for erroneous admission of evidence unless:

15

'There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated to make clear the specific ground of the objection or motion.' The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospects of reversal. [Citation.] [¶] Evidence Code section 353 does not exalt form over substance. No particular form of objection or motion is required; it is sufficient that the presentation contain a request to exclude specific evidence on the specific legal ground urged on appeal." (*People v. Morris* (1991) 53 Cal.3d 152, 187-188.) Caterpillar does not cite any part of the record to show it objected to the admission of this evidence, either before or during trial.

### 2. *Applicable legal standards*

On appeal, we review the trial court's denial of a motion for a JNOV and examine if substantial evidence supports the original verdict. (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) A motion for a JNOV can only be granted by a court if, after reviewing the evidence in the light most favorable to the prevailing party, there is no substantial evidence to support the verdict. (*Ibid.*)

The testimony of a single witness, including the testimony of an expert, may be sufficient to constitute substantial evidence. (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 487 (*Leslie G.*).) However, when experts base their conclusions on factors that are "speculative, remote or conjectural," or on "assumptions . . . not supported by the record," the experts' opinions "cannot rise to the dignity of substantial evidence" (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135) and a judgment based solely on such opinions "must be reversed for lack of substantial evidence." (*Id.* at p. 1136; accord, *Leslie G.*, *supra*, at p. 487.)

16

A cause of action for strict product liability must be supported by substantial evidence of an actual defect, which was a substantial factor in causing the claimed damages. (*Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62-63; *Stephen v. Ford Motor Co.* (2005) 134 Cal.App.4th 1363, 1373.) The mere occurrence of injury is not sufficient to draw the inference that a product defect must have been its cause. (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670.) Thus, a manufacturer is not held to a duty of insuring that a product is free from all potential for harm. (*Ibid.*)

In *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413 (*Barker*), the California Supreme Court articulated two tests for determining whether a product has a design defect. These are the "consumer expectation" test (*id.* at p. 430) and the " 'risk-benefit' " test (*id.* at p. 431). Under the consumer expectation test, a product is defectively designed if it does not perform as safely as an ordinary consumer would expect when used as intended or as reasonably foreseeable. (*Id.* at p. 430.) In explaining this test, the California Supreme Court stated, "This initial standard, somewhat analogous to the Uniform Commercial Code's warranty of fitness and merchantability [citation], reflects the warranty heritage upon which California product liability doctrine in part rests. . . . When a product fails to satisfy such ordinary consumer expectations as to safety in its intended or reasonably foreseeable operation, a manufacturer is strictly liable for resulting injuries." (*Id.* at pp. 429-430.)

The other design defect test is the risk-benefit test. This alternative test is necessary because sometimes the ordinary consumer's expectations are not especially instructive in determining whether a design defect exists. For example, a consumer may not know exactly what to expect, since the consumer may not know how safely a product could be made. (*Barker, supra,* 20 Cal.3d at p. 429.) Thus, a product is also defectively designed even though it meets the consumer's expectations if, through hindsight, the product is found to have a design which embodies " 'excessive preventable danger.' " (*Id.* at p. 430.) In particular, if the jury finds the risks of the design outweigh the benefits,

17

then the product will be deemed to include a design defect. (*Ibid*.) In applying this test, the jury may consider the seriousness of the danger posed by the challenged design, the likelihood that the danger would occur, whether a safer design is mechanically feasible, the financial aspects of an improved design, and any negative consequences the alternative design would impose upon the product and the consumer.

In this case, respondents' experts, Dr. Jacqueline Paver and Steven Meyer, testified about alternative designs that, in their opinion, would have protected Will from fatal injury. The experts suggested four specific alternatives: (1) the flange associated with mounting the rear forestry screen outside the bulldozer's cab could be eliminated; (2) side bolsters and a three-point restraint could have been installed, helping to prevent an occupant from striking rigid surfaces inside the cab; (3) air bags could be installed; and, (4) a four-point harness could have been used in place of a lap belt. Caterpillar suggests that respondents' own experts essentially admitted at trial that the first three of these purported defects would either have not prevented Will's fatal injuries or were infeasible. Assuming that this is so, and that there was thus not substantial evidence to support the jury's verdict against Caterpillar with respect to these particular claims, we are left with the final defect: the failure to install a four-point harness. So long as there was substantial evidence presented such that a jury could reasonably conclude this alleged defect was a substantial factor in Will's death, the trial court properly denied Caterpillar's motion for JNOV. We think there was.

Respondents' expert testified the four-point harness was a suitable and a technologically feasible alternative design for the D6N bulldozer. Caterpillar's experts, on the other hand, testified a four-point operator restraint would be neither reliable nor safe, since it would interfere with the bulldozer's operation, as well as the operator's ability to move inside the cab. Consequently, the parties presented exactly the kind of evidence relevant to the risk-benefit test: respondents' evidence showed the four-point restraint would have prevented Will from striking his head against the hard surfaces

18

inside the cab, while Caterpillar's evidence was that a four-point harness would introduce greater hazards into everyday use of the bulldozer. As they did below, Caterpillar argues that the testimony of their experts is *more* credible than the testimony of respondents' experts because respondents' experts had no experience in the design of heavy construction equipment, including bulldozers. As the trial court sagely noted at the hearing on Caterpillar's posttrial motions: "I thought you made a very compelling argument at trial for exactly that position, and apparently at least three [jurors] agreed with you on that . . . *but isn't that why we have juries* to decide if they believe you or they believe [respondents' witness]?" (Italics added.) Caterpillar is asking this court to substitute its evaluation of the conflicting evidence for that of the jury, and we decline to do so.

### C. *The trial court did not abuse its discretion in making the evidentiary rulings Caterpillar raises on appeal*

Caterpillar next raises what it claims are a series of evidentiary errors made by the trial court, arguing that the cumulative effect of these errors warrants a new trial.

"Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion." (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.) " 'The abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence.' [Citation.] 'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 919, quoting *People v. Guerra* (2006) 37 Cal.4th 1067, 1113.) "In appeals challenging discretionary trial court rulings, it is the appellant's burden to establish an abuse of discretion." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.) These principles apply to both lay witness and expert testimony. (*People v. Thornton* (2007) 41

19

Cal.4th 391, 429; *Sargon Enterprises*, *Inc*. *v. University of Southern California* (2012) 55 Cal.4th 747, 773.) With these principles firmly in mind, we turn now to each of Caterpillar's claimed errors.

First, Caterpillar asserts the trial court improperly permitted respondents to introduce patent documents, alternative design documents, testing photographs, and videos through their design expert, despite the fact these materials were only disclosed in the two weeks prior to trial. Caterpillar argues it was prejudiced by this late production and could not prepare an effective response.

Caterpillar raised its objections to this evidence during the trial, rather than in a motion in limine. As respondents' counsel argued to the trial court, the materials were, in fact, timely produced: "It was all turned over to Mr. Di Saia personally at Mr. Meyer's deposition. . . . We were not obligated to turn it over any sooner and we couldn't have turned it over any sooner. So there's been no motion in limine that somehow we violated discovery." The trial court considered Caterpillar's objections to allowing this evidence and rejected them, finding that it "will be able to cross examine the witness as to the foundation, whether it's relevant, whether or not it will work, whether or not he knows it will work and the jury can analyze that and make a decision."

Caterpillar fails to show how the trial court's ruling was an abuse of discretion. It admits it received the materials approximately two weeks before trial, yet waited until Meyers' testimony at trial to object to its admission. Had it genuinely been concerned about its inability to craft an effective response to this evidence in the two weeks before trial, it certainly could have brought either an in limine motion seeking its preclusion or a postponement of the trial. Having failed to do so, the trial court properly admitted the evidence.

Second, Caterpillar argues the court erred in allowing respondents to present evidence of automobile products even though the design of an automobile is utterly dissimilar to the design of a track-type tractor. This claim fails.

20

Caterpillar's expert testified, however, that although the "geometry" of an automobile would be "very different" from that of a bulldozer, restraint systems in both types of vehicles are subject to the same laws of physics. In addition, as described above, Caterpillar was free to, and did, argue to the jury this very point, i.e., that the testimony of respondents' experts should be given little or no credit due to their lack of experience with the design and operation of heavy equipment. The trial court did not abuse its discretion in permitting this evidence in and allowing the jury to weigh the competing testimony as it saw fit.

Third, Caterpillar contends, without citation to the record, that the "trial court erred in allowing [respondents] to introduce old and irrelevant patents." This argument simply rehashes Caterpillar's argument that respondents' evidence of a design defect, specifically failure to incorporate air bags in the bulldozer, did not support a verdict in their favor. As discussed above, however, even if respondents' air bag design defect evidence were insufficient to warrant a verdict in their favor, there was substantial evidence on which the jury could still find a design defect based on the failure to install a four-point harness. As a result, there was no abuse of discretion by the trial court in admitting this evidence and, even if there were, Caterpillar could not establish how it was prejudiced thereby.

Fourth, Caterpillar claims the trial court abused its discretion in allowing an expert, who was designated as non-retained, to render retained expert opinions without proper disclosure in violation of Code of Civil Procedure section 2034.210, subdivision (b). Dr. Hain, a forensic pathologist, was employed by the Monterey County Sheriff-Coroner as an independent contractor and performed the postmortem examination on Will. He was subsequently retained by respondents to inspect the bulldozer and opine on whether he believed Will's skull fracture was caused by impact with the flange for the rear forestry screen. Caterpillar contends nondisclosure of Dr. Hain as a hired expert was

21

prejudicial as it deprived Caterpillar of the opportunity to retain its own forensic pathologist to rebut his testimony.

The argument fails for three reasons: (1) Caterpillar had the opportunity to, and did, depose Dr. Hain before trial thus negating any surprise regarding the opinions he would offer at trial; (2) Caterpillar's neurosurgeon, Dr. Manley, was able to review all of Dr. Hain's opinions before his own deposition, "went out and saw that dozer" himself, and testified contrary to Dr. Hain at trial; and, (3) Dr. Hain's opinion that Will's fatal injury was due to his head striking the flange is irrelevant, since both respondents and Caterpillar agreed that "ultimately it's [Will's] upper torso being allowed to move around that allows his head to strike some metal object" inside the cab, not the flange specifically. Accordingly, the trial court did not err in permitting Dr. Hain to testify.

Fifth, Caterpillar argues the trial court erred by permitting respondents to show the jury an exemplar seat, which respondents' counsel found on the Internet and, without authentication, introduced the exhibit ostensibly for impeachment purposes. This seat was not relevant because it was purchased just before trial, some eight years after Caterpillar manufactured the subject bulldozer, and admitting it in this case was highly misleading and prejudicial.

Even if the trial court erred in permitting respondents' counsel to produce the exemplar seat during trial, Caterpillar was able to elicit testimony from its expert witness, Spangler, about why this particular seat would likely not be appropriate for use in a bulldozer. Specifically, Spangler testified that the four-point restraint would inhibit an operator from looking behind the machine, and the retractors would likely lock up periodically during the machine's operation so the operator would feel compelled to remove and reattach the seat belt to free the mechanism. The jurors were free to decide how much credence to place on Spangler's testimony on why this particular seat was not suitable for use in a bulldozer.

22

Sixth, Caterpillar contends the trial court denied it the right to introduce evidence of official records prepared by Cal Fire on the ground that the reports were inadmissible hearsay. Caterpillar renews its argument that the reports satisfied the official records exception to the hearsay rule and should have been admitted under Evidence Code section 1280. Caterpillar argues that the SART report in particular would have allowed the jurors to see that Cal Fire did not approve of Will returning to the hillside to assist Emerson and, in fact, had faulted its own personnel and policy for the accident.

The trial court did not err in excluding the materials at issue. They were hearsay and did not meet the official records exception because the "sources of information and method and time of preparation" did not "indicate [their] trustworthiness," as required by Evidence Code section 1280, subdivision (c).

Even if the reports at issue were not hearsay, however, Caterpillar has not shown prejudice from the trial court's ruling. As the trial court noted, Caterpillar was free to call the leader of the SART team, Cal Fire Chief John Ferriera, to testify at trial. Although Caterpillar advised the trial court it intended to call Ferriera as a witness, for some unexplained reason, it elected not to.

Consequently, since Caterpillar has failed to show that the trial court abused its discretion with respect to any of these evidentiary rulings, or that it was prejudiced thereby, there can be no cumulative error.

D. *The trial court properly excluded evidence of collateral source payments*

Caterpillar argues the trial court's ruling, precluding it from introducing evidence of collateral source payments, specifically the death benefits Diana was receiving, constitutes reversible error. We disagree.

The collateral source rule provides that "if an injured party receives some compensation for his [or her] injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Helfend v. Southern Cal. Rapid Transit Dist.*

23

(1970) 2 Cal.3d 1, 6 (*Helfend*).) The chief purpose of the collateral source rule is to prevent the defendant tortfeasor from escaping its full share of liability. (*Id*. at p. 10.)

As it did below, Caterpillar relies principally on *Rotolo Chevrolet v. Superior Court* (2003) 105 Cal.App.4th 242, for the proposition that Will's disability pension is not collateral to the retirement pension respondents claim to have lost. In Caterpillar's view, *Rotolo* holds: "a pension is a pension is a pension," and therefore, respondents are "not entitled to characterize the disability pension payments . . . as a collateral source replacing regular pension payments." (*Id*. at p. 247.)

Though *Rotolo* has a limited superficial appeal, it is readily distinguishable on its facts. The plaintiff in *Rotolo*, who was still alive but disabled, was seeking to recover *both* his disability pension along with the regular pension he lost as a consequence of his premature retirement. However, the death benefit to Diana was not an *alternative* to Will's pension payments; it did not even exist before Will's death. It is, instead, a *new* benefit flowing to Diana as a direct result of Will's death. It goes without saying that Will could not have received *both* his regular pension and the death benefit since payment of the latter was contingent on his dying. Indeed, it is entirely possible Diana would have received a death benefit from her husband's pension even if Will had survived the accident, subsequently retired, received some pension payments, and *then* died. This further distinguishes the death benefit Diana received from the situation in *Rotolo*, in that the plaintiff in that case could under no circumstances retire for disability and subsequently receive his regular pension, or vice versa.

Furthermore, Diana did not, as Caterpillar argues, receive a "triple recovery." Her lost share of her husband's earnings up to the projected date of his retirement and the lost pension benefits constitute one item—lost earnings—that covered two time periods— before and after retirement. Accordingly, at most she received the "double recovery" implicated in most applications of the collateral source rule: an award of damages for her husband's lost earnings and a death benefit paid by the collateral source. Whether the

24

plaintiff obtains a "double recovery" is inconsequential.  (*Helfend*, *supra*, 2 Cal.3d at pp. 12-13.)  "In the end, while barring the collateral source from consideration may confer a benefit on the victim, allowing it to be considered would benefit the wrongdoer.  So, courts choose in such cases to benefit the victim."  (*Smock v. State of California* (2006) 138 Cal.App.4th 883, 888.)

As in *McKinney v. California Portland Cement Co.* (2002) 96 Cal.App.4th 1214 and other cases applying the collateral source rule, Caterpillar's argument is, in essence, an attempt to avoid paying the full damages for which the jury found it liable because respondents received compensation under Will's employment benefits.  However, the death benefit was a collateral source, and it is Caterpillar's responsibility to compensate for all harm caused when Will died while operating its product, not just respondents' net loss.  "The purpose of the rule is not served by allowing the defendant to escape liability for a wrong merely because the decedent was wise enough to provide for his spouse after death."  (*Id.* at p. 1223.)

Accordingly, the trial court did not err in finding the death benefit payments at issue were a collateral source and that evidence of those payments was inadmissible.

## III.    DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

25

 

 

 

 

---

Premo, J.

 

 

WE CONCUR:

 

 

---

Rushing, P.J.

 

 

---

Elia, J.